DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR *v.* RASMUSSEN ET AL.

No. 77–1465.   Argued November 28, 1978—Decided February 21, 1979*

———————

*Together with No. 77–1491, *Geo Control, Inc., et al.,* v. *Rasmussen et al.,* also on certiorari to the same court.

Rehnquist, J., delivered the opinion of the Court, in which all other Members joined except Powell, J., who took no part in the consideration or decision of the cases.

*Kent L. Jones* argued *pro hac vice* for petitioner in No. 77–1465. On the brief were *Solicitor General McCree, Louis F. Claiborne, Laurie M. Streeter,* and *Joshua T. Gillelan II. Albert H. Sennett* argued the cause for petitioners in No. 77–1491. With him on the brief was *Frank B. Hugg.*

*James Buckley Ostmann* argued the cause for respondents in both cases. With him on the brief was *John R. Coyle.*†

---

† *David Bonderman* filed a brief for the American Insurance Assn. et al. as *amici curiae* urging reversal in both cases.

Mʀ. Jᴜsᴛɪᴄᴇ RᴇʜɴQᴜɪsᴛ delivered the opinion of the Court.

In May 1973 William Rasmussen was employed as a hydrologist by Geo Control, Inc., which was under contract with the United States to perform work in South Vietnam. Rasmussen was fatally injured during the course of his employment when the vehicle in which he was riding was blown up by a land mine. His employment was within the coverage of the Defense Base Act, 42 U. S. C. § 1651 *et seq.*, which incorporates the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.* (Act). It is undisputed that Rasmussen's surviving widow and son,[1] respondents here, are entitled to death benefits under § 9 of the Act, 33 U. S. C. § 909; the issue dividing the parties and the Courts of Appeals[2] is whether *death* benefits payable under the Act are subject to the maximum limits expressly placed on *disability* payments by § 6 (b)(1). The Act's language and legislative history persuade us that they are not.

I

Prior to passage of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 86 Stat. 1251, both disability and death benefits payable under the Act were subject to the same minimum and maximum limitations. Former § 6 (b) limited disability benefits to no more than $70 per week and no less than $18 per week. Death benefits were limited under § 9 (b) to 66⅔% of the deceased's "average weekly wages," which were "considered to have been not more than $105 nor less than $27 . . . ." 33 U. S. C. § 909 (e) (1970

---

[1] Rasmussen's surviving son is entitled to benefits until his 18th birthday, or, if he qualifies under the Act as a student, until his 23d birthday. See 33 U. S. C. §§ 902 (14), (18), and 909 (b).

[2] Compare 567 F. 2d 1385 (case below), with *Director, Office of Workers' Comp.* v. *O'Keefe,* 545 F. 2d 337 (CA3 1976), and *Director, Office of Workers' Comp.* v. *Boughman,* 178 U. S. App. D. C. 132, 545 F. 2d 210 (1976).

ed.). Accordingly, weekly death benefits, like disability benefits, could not exceed $70 nor be less than $18.[3] The $70 maximum on death and disability benefits, established in 1961, gradually lost real value as inflation exacted its annual toll,[4] and in 1972 Congress moved to give covered workers added protection.

The basic formula for determining compensation for permanent total disability—66⅔% of the employee's average weekly wages—was left unchanged by the 1972 Amendments. The Amendments, however, replaced the $70 maximum limitation on disability benefits with an entirely new limitation scheme tied to the "applicable national average weekly wage." New § 6 (b)(1) provides in pertinent part:

"[C]ompensation for disability shall not exceed the

---

[3] Under former § 9 (b) a surviving widow was entitled to 35% of her deceased husband's average wages and an additional 15% of the deceased's wages for each surviving child, subject to a limit of 66⅔% of the deceased's wages. Thus, a widow without children, although nominally entitled by former § 9 (b) to 35% of her deceased husband's average weekly wages was actually entitled only to 35% of $105. A widow with three or more children, however, was entitled to the maximum aggregate percentage of weekly wages (66⅔), which would result in an award of $70 in weekly death benefits. The 1972 Amendments increased the percentage shares of surviving widows and children to 50 and 16⅔, respectively, although the maximum aggregate percentage limitation of 66⅔ was retained.

[4] According to 1972 congressional reports, the average weekly wage for private, nonagricultural employees was $135 a week, while longshoremen averaged over $200 per week in some ports. H. R. Rep. No. 92–1441, p. 1 (1972), Legislative History of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Labor and Public Welfare by the Subcommittee on Labor), p. 207 (1972) (hereinafter Leg. Hist.); S. Rep. No. 92–1125, p. 4 (1972), Leg. Hist. 66. The $70 limitation on death and disability benefits precluded most employees and their survivors from receiving 66⅔% of the employee's average weekly wages, and in some cases the $70 maximum constituted as little as 30% of the employee's average weekly wages. S. Rep. No. 92–1125, p. 5, Leg. Hist. 67.

following percentages of the applicable national average weekly wage as determined by the Secretary . . .

"(A) 125 per centum or $167, whichever is greater, during the period ending September 30, 1973.

"(B) 150 per centum during the period beginning October 1, 1973, and ending September 30, 1974.

"(C) 175 per centum during the period beginning October 1, 1974, and ending September 30, 1975.

"(D) 200 per centum beginning October 1, 1975." 33 U. S. C. § 906 (b)(1).

The "applicable national average weekly wage" is determined annually by the Secretary of Labor. 33 U. S. C. § 906 (b)(3). The Senate Committee on Labor and Public Welfare estimated that approximately 90% of the disabled workers covered under the amended Act would receive benefits equal to a full 66⅔% of their average weekly wages. S. Rep. No. 92–1125, p. 5 (1972), Legislative History of the Longshoremen's and Harbor Workers' Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Labor and Public Welfare by the Subcommittee on Labor), p. 67 (1972) (hereinafter Leg. Hist.). The four-step phase-in of the section's maximum limitation from 125% to 200% of the applicable national average weekly wage was designed to ease the impact on covered employers of the increase in compensation payments, which Congress expected to at least double for most covered workers. *Ibid.*

Section 9 (b) was amended in 1972 to increase death benefits to surviving spouses from 35% to 50% of the deceased's average weekly wages. Death benefits to surviving children were increased from 15% to 16⅔% of the deceased's average weekly wages. Total weekly death benefits payable to survivors, however, are still limited to 66⅔% of the deceased's average weekly wage. 33 U. S. C. § 909 (b). The 1972 Amendments deleted the specific dollar minimum and maximum limitations on average weekly wages and substi-

tuted in their place a provision dealing only with a minimum limitation, which was tied to the applicable national average weekly wage. Section 9 (e) now provides:

"In computing death benefits the average weekly wages of the deceased shall be considered to have been not less than the applicable national average weekly wage as prescribed in section 6 (b) but the total weekly benefits shall not exceed the average weekly wages of the deceased." 33 U. S. C. § 909 (e).

Pursuant to § 9, respondents claimed combined death benefits of $532 per week, two-thirds of Rasmussen's average weekly wages of $798. Geo Control, its insurance carrier, and the Director of the Department of Labor's Office of Workers' Compensation Programs (OWCP), petitioners here, contended that the limitations on disability payments contained in § 6 (b)(1) of the Act—initially $167 per week and now $396.50 per week [5]—apply to death benefits in the same manner as to benefits for permanent total disability.[6] The

---

[5] The national average weekly wages determined by the Secretary of Labor since 1972, along with corresponding maximum benefit levels under § 6 (b)(1), are as follows:

| Effective Date | National Average Weekly Wage | Section 6 (b)(1) Maximum |
|---|---|---|
| 11/26/72 | $131.80 | $167.00 |
| 10/1/73 | 140.36 | 210.54 |
| 10/1/74 | 149.14 | 261.00 |
| 10/1/75 | 159.19 | 318.38 |
| 10/1/76 | 171.27 | 342.54 |
| 10/1/77 | 183.61 | 367.22 |
| 10/1/78* | 198.25 | 396.50 |

*Based on preliminary figures.

[6] The dispute was initially litigated before the Deputy Commissioner for the Fifteenth Compensation District of the Department of Labor's Office of Workers' Compensation Programs (OWCP), who ruled that § 6 (b)(1)'s limitations on compensation apply to death benefits as well

dispute was submitted to an Administrative Law Judge, who sustained respondents' position. Petitioners appealed the adverse ruling to the Benefits Review Board, which affirmed. The legislative history of the 1972 Amendments convinced the Board that "elimination of the maximum benefit provision from Section 9 (e) of the Act . . . was done consciously and intentionally" and that "failure to substitute a new maximum was . . . a deliberate action." App. to Pet. for Cert. in No. 77-1465, pp. 22A–23A. Petitioners appealed the Board's order directly to the United States Court of Appeals for the Ninth Circuit. 33 U. S. C. § 921 (c). The Court of Appeals affirmed, largely adopting the reasoning of the Review Board. We granted certiorari to resolve a conflict among the Courts of Appeals on this issue,[7] 436 U. S. 955 (1978), and we now affirm the judgment of the Court of Appeals for the Ninth Circuit.

## II

Petitioners' case for incorporating the maximum limitations on disability benefits of § 6 (b)(1) into the death benefit provisions of § 9 rests entirely on § 6 (d), which in pertinent part provides that "determinations" made under the section "shall apply to employees or survivors . . . receiving compensation for permanent total disability or death benefits . . . ." 33 U. S. C. § 906 (d). This subsection's references to "survivors" and "death benefits" demonstrate, according to petitioners, that Congress intended death benefits to be limited by the compensation maximums contained in § 6 (b)(1). Anticipating the obvious question—why did not Congress, either expressly or by reference to § 6 (b)(1), put the ceiling on death benefits back into the section of the Act dealing with

---

as to benefits for permanent total disability. On appeal the Benefits Review Board vacated the decision on the ground that the Deputy Commissioner lacked authority to resolve the issue.

[7] See n. 2, *supra*.

death benefits—the Director of OWCP concedes that § 9 (e) was "[u]ndeniably, the most obvious place to stipulate a maximum on death benefits," but suggests that Congress merely "overlooked" this fact when amending the death benefits provisions. Brief for Petitioner in No. 77–1465, pp. 28–29.

One need only state petitioners' argument to recognize its flaws. They suggest, on the one hand, that Congress forgot to stipulate a maximum on death benefits when it amended § 9 (e), although that section had contained a fixed ceiling on death benefits since the Act's initial passage in 1927.[8] On the other hand, petitioners urge that Congress remembered the question of death benefit maximums while considering § 6, and rather than incorporate a death benefits ceiling in the section of the Act dealing with death benefits, Congress consciously decided to limit death benefits in the section dealing with disability compensation.

The logic of petitioners' position is further weakened by the structure of § 6 itself, for if Congress had chosen that section as the vehicle for limiting death benefits, it would have been a simple matter to add the words "and death" after the word "disability" in the opening sentence of § 6 (b)(1). Nor does petitioners' contention deal with the fact that Congress had the collective presence of mind to include a *minimum* limitation on death benefits in § 9 (e). The Director maintains that the path petitioners urge us to follow, while admittedly "tortuous," ultimately leads to "what

---

[8] The original Act provided that compensation benefits for disability were not to exceed $25 per week. Act of Mar. 4, 1927, § 6 (b), 44 Stat. 1426. The maximum compensation benefit for death was 66⅔% of the employee's average weekly wages, considered to be not more than $37.50 per week. § 9 (c), 44 Stat. 1430. Thus, the maximum weekly benefit for both disability and death was $25. Subsequent amendments raised benefit levels, but did not disturb the relationship between disability and death compensation maximums. See Act of June 24, 1948, ch. 623, §§ 1, 3, 62 Stat. 602; Act of July 26, 1956, ch. 735, §§ 1, 4, 70 Stat. 654, 655; Act of July 14, 1961, Pub. L. 87–87, §§ 1, 2, 75 Stat. 203.

may be assumed to have been the congressional intent to avoid disparate treatment" of disability and death beneficiaries. Brief for Petitioner in No 77–1465, pp. 11, 32. We agree that petitioners' suggested interpretation of the Act is tortuous, and believe that it is refuted by the plain language and legislative history of the pertinent provisions of the 1972 Amendments.

## A

The language of § 9 (e) is unambiguous: the average weekly wages on which death benefits are calculated can be no less than the applicable national average weekly wage. In amending § 9 (e), Congress replaced specific minimum and maximum limitations on average weekly wages, and hence on death benefits, with a minimum limitation governed by the applicable national average weekly wage. That the omission of a maximum limitation on death benefits was inadvertent is disproved by the legislative history of the 1972 Amendments.

In 1971 two pairs of identical bills were introduced in the 92d Congress and considered by the Senate Committee on Labor and Public Welfare and the House Committee on Education and Labor. S. 525 and H. R. 3505 would have retained fixed dollar maximums for both disability and death benefits.[9] In contrast, S. 2318 and H. R. 12006, which ultimately formed the nucleus of the 1972 Amendments, proposed

---

[9] S. 525, 92d Cong., 1st Sess., §§ 4 (a), 8 (c) (1971), Leg. Hist. 395, 399; H. R. 3505, 92d Cong., 1st Sess., §§ 4 (a), 8 (c) (1971), Leg. Hist. 417, 421.

Section 4 (a) of both the House and Senate bills provided in pertinent part: "Section 6 (b) of such Act is amended to read as follows:

" 'Compensation for disability shall not exceed $119 a week and compensation for total disability shall not be less than $35 per week . . . .' "

Section 8 (c) of both bills would have amended § 9 (e) of the Act to read: "In computing death benefits the average weekly wages of the deceased shall be considered to have been not more than $178.50, nor less than $52.50, but the total weekly compensation shall not exceed the weekly wages of the deceased."

the elimination of fixed dollar ceilings on both disability and death benefits.[10]

The difference in treatment of benefit maximums between the competing bills could hardly have gone unnoticed. Senator Eagleton opened hearings on S. 2318 and S. 525 before the Subcommittee on Labor of the Committee on Labor and Public Welfare, summarizing the intent of the competing bills as follows:

"S. 2318, which I cosponsored with Senator Williams, would eliminate the maximum payment limitations. . . .

"The second bill, S. 525, introduced by the late Senator Prouty at the request of the administration, would also increase the benefits although retaining a maximum limitation." Hearings on S. 2318 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 2 (1972) (hereinafter Hearings).

Supporters of both measures vigorously debated the virtues and vices of fixed ceilings on disability and death benefit payments.[11] The provisions of S. 2318 and H. R. 12006 as

---

[10] S. 2318, 92d Cong., 2d Sess., §§ 4 (a), 10 (b) (1971), Leg. Hist. 6, 10; H. R. 12006, 92d Cong., 1st Sess., §§ 4 (a), 10 (b) (1971), Leg. Hist. 146, 149–150.

As originally introduced, § 10 (b) of both the House and Senate bills would have amended § 9 (e) of the Act to read: "In computing death benefits the average weekly wages of the deceased shall be considered to have been not less than $80 but the total weekly compensation shall not exceed the weekly wages of the deceased." Original § 4 (a) of both bills contained a similar provision for disability benefits: "Section 6 (b) of such Act is amended to read as follows: '(b) Compensation for total disability shall not be less than $54 per week: *Provided, however,* That, if the employee's average weekly wages as computed under section 10 are less than $54 per week, he shall receive as compensation for total disability his average weekly wages.' "

[11] Witnesses representing workers covered by the Act generally supported removal of fixed ceilings on compensation payments. Witness

reported by their respective Committees were identical and were ultimately enacted as the Longshoremen's and Harbor

Thomas W. Gleason, President of the International Longshoremen's Association, AFL–CIO, testified:

"We strongly support the enactment of S. 2318 as the most effective proposal to accomplish the long overdue increase in the benefit levels of injured longshoremen. First and foremost, that bill would eliminate the artificial and totally unrealistic restrictions on benefit amounts. This would enable compensation awards, for the first time, to reflect realistically the loss of earnings suffered by injured employees. . . .

"The administration bill, S. 525, would also raise benefit levels. The proposed increase in maximum weekly compensation from $70.00 to $119.00 represents a substantial improvement, but one that is already obsolete. . . .

.        .              .          .            .

"We urge that the Congress not adopt a benefit level grounded on built-in obsolescence. Far more equitable is the approach manifested in S. 2318." Hearings 156–158.

See *id.*, at 63 (testimony of Howard McGuigan, Legislative Representative, AFL–CIO), 133 (testimony of Patrick Tobin, Washington Representative, International Longshoremen's and Warehousemen's Union), 700 (testimony of Frank E. Fitzsimmons, General President, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America).

Not surprisingly, representatives of employers subject to the Act's provisions were generally opposed to elimination of benefit maximums. Edward D. Vickery, representing the National Maritime Compensation Committee, opposed S. 2318, stating: "[W]e respectfully submit that it is not advisable to remove the monetary maximum benefits payable per week under the Longshoremen's Act and therefore recommend that the provisions of Section 8 of S. 525 be retained in this regard." Hearings 334.

Witness Ralph Hartman, an assistant manager in the Safety and Workmen's Compensation Division of Bethlehem Steel Corporation, proposed a compromise position:

"[W]e endorse the basic concepts of S. 2318, and propose innovations or variations which we consider urgent and demanding, yet equitable to all concerned.

.        .              .          .            .

"Of major impact and importance to the industry are the proposals to

Workers' Act Amendments of 1972.[12] The Committee Re-
ports accompanying the House and Senate bills clearly reflect
the Committees' understanding that the minimum and maxi-
mum limitations on death benefits of former § 9 (e) were
being eliminated and that only a minimum benefit provision
tied to the applicable national average weekly wage was being
substituted in their place.[13] In light of this evidence of

increase weekly benefits. One such proposal would amend section 6 (b) of
the act by increasing the minimum weekly rate from $18 to $54 and
eliminating the present maximum weekly benefit rate of $70.

"We agreed that the minimum rate should be increased. However, this
proposal leaves us with a weekly benefit rate of two-thirds of the em-
ployee's average weekly earnings without limitation.

.        .        .        .        .

"We recognize the intent of the proposal, and we suggest for your
consideration that the maximum weekly benefit be predicated upon the
average weekly wage in the shipbuilding and ship repair industry, that it
be 66 and two-thirds percent of the injured employee's average weekly
wage computed under section 10, subject to a maximum of 150 percent
of the average weekly wage of the shipbuilding and ship repair industry."
*Id.*, at 171–172.

It is inconceivable that Congress, with this debate on benefit maximums
raging all about it, unwittingly omitted a death benefit ceiling in
amended § 9 (b).

[12] S. 2318 was passed by the Senate on September 14, 1972. 118 Cong.
Rec. 30670, 30674. H. R. 12006 was passed by the House on October 14,
1972, 118 Cong. Rec. 36376, 36389, and returned to the Senate, which con-
curred in the identical House version. 118 Cong. Rec. 36265, 36274
(1972).

[13] Precisely this understanding is expressed in the House Report which
accompanied H. R. 12006:

"Subsection (d) of this section amends section 9 (e) of the Act, elimi-
nating the dollar minimum and maximum set out under persent [*sic*] law
for the average weekly wages of the deceased to be used in computing
death benefits. The minimum substituted by this amendment is the appli-
cable national average weekly wage as prescribed in section 6 (b) of the
Act, except that the total weekly benefits may not exceed the actual
average weekly wages of the deceased." H. R. Rep. No. 92–1441, p. 19
(1972), Leg. Hist. 225.

Both the House and Senate Reports, in discussing the major provisions

congressional intent, we find it impossible to conclude that the absence of a fixed maximum limitation on death benefits in § 9 (e) was the result of inadvertence.

## B

The benefit maximums contained in § 6 (b)(1) are plainly restricted to "compensation for disability." Petitioners argue, however, that Congress made § 6 (b)(1)'s disability benefit maximums applicable to death benefits through § 6 (d). Close examination of the wording used by Congress in the latter provision persuades us otherwise.

Section 6 (d) provides:

> "Determinations under this subsection with respect to a period shall apply to employees or survivors currently receiving compensation for permanent total disability or death benefits during such period, as well as those newly awarded compensation during such period."

Since there are no "determinations" made under § 6 (d), its reference to "this subsection" is plainly in error. The parties agree, and we conclude, that the words "this subsection" should read "this section." [14] The question thus becomes what "determinations . . . with respect to a period" did Congress have in mind when it enacted § 6 (d).

---

of the respective bills, deal expressly with the subject of minimum and maximum death benefits, noting that such benefits are "subject to a maximum of 66⅔ percent of the [deceased's] average weekly wages" and to "[a] minimum . . . tied to the applicable national average weekly wage . . . ." S. Rep. No. 92–1125, p. 6 (1972), Leg. Hist. 68; H. R. Rep. No. 92–1441, p. 4 (1972), Leg. Hist. 210.

[14] Section 6 (d)'s reference to "this subsection" apparently refers to subsection (a) of § 5 of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 86 Stat. 1252, and hence to §§ 6 (b)– (d) of the Act. See *Director, Office of Workers' Comp. Programs* v. *O'Keefe,* 545 F. 2d, at 344; *Director, Office of Workers' Comp. Programs* v. *Boughman,* 178 App. D. C., at 137, 545 F. 2d, at 215.

The operative words of the subsection, "determinations" and "period," appear together in § 6 in only one other place. Paragraph (3) of § 6 (b) provides:

"As soon as practicable after June 30 of each year, and in any event prior to October 1 of such year, the Secretary shall *determine* the national average weekly wage for the three consecutive calendar quarters ending June 30. Such *determination* shall be the applicable national average wage for the *period* beginning with October 1 of that year and ending with September 30 of the next year. The initial *determination* under this paragraph shall be made as soon as practicable after [October 27, 1972]." 33 U. S. C. § 906 (b)(3). (Emphasis added.)

Elsewhere in § 6, both minimum and maximum limits on total disability benefits are tied to the "applicable national average weekly wage as *determined* by the Secretary under paragraph (3) . . . ." 33 U. S. C. § 906 (b)(1); see § 906 (b)(2). Congress' careful use of the word "determination" and its verb form strongly suggests that it intended the term to refer only to the Secretary of Labor's annual *determination* under § 6 (b)(3) of the national average weekly wage, not to the mathematical *computation* of disability benefit maximums contemplated under § 6 (b)(1). This view of § 6 (d) is confirmed by the provision's legislative history. The Senate Committee on Labor and Public Welfare, in its section-by-section analysis of S. 2318, stated:

"Subsection (d) states that *determinations* of *national average weekly wage* made with respect to a period apply to employees or survivors currently receiving compensation for permanent total disability or death benefits, as well as those who begin receiving compensation

for the first time during the period." S. Rep. No. 92–1125, p. 18 (1972), Leg. Hist. 80.[15]

Because determinations of the national average weekly wage govern minimum death benefits as well as both minimum and maximum total disability benefits, § 6 (d)'s reference to "survivors . . . receiving . . . death benefits" is not surprising. Congress intended increases in the national average weekly wage to be reflected by corresponding increases in minimum death benefits and both minimum and maximum total disability benefits.[16] See S. Rep. No. 92–

---

[15] Petitioners place heavy reliance on the following passage from the Senate Report accompanying S. 2318:

"To the extent that employees receiving compensation for total permanment [sic] disability or survivors receiving death benefits receive less than the compensation they would receive if there were no phase in, their compensation is to be increased as the ceiling moves to 200 percent." S. Rep. No. 92–1125, p. 5 (1972), Leg. Hist. 67.

This language does indeed suggest that the gradual annual increase in maximum benefits from 125% to 200% of the national average provided in § 6 (b)(1) applies to survivors as well as to disabled employees. The quoted statement, however, is followed immediately in the Senate Report by a conflicting statement. In apparent reference to the combined effect of § 6 (b)(3) and § 6 (d), the Senate Report states: "The bill also requires an annual redetermination by the Secretary which will allow any increase in the national average weekly wage to be reflected by an appropriate increase in compensation payable under the Act." S. Rep. No. 92–1125, supra, at 5–6, Leg. Hist. 67–68; see n. 17, infra. This latter statement is consistent with our reading of § 6, and to the extent the earlier statement is an indication of legislative intent, we agree with the Court of Appeals that "it is overwhelmingly outweighed by the contrary purport of the legislative history as a whole." 567 F. 2d, at 1388 n. 5.

[16] Petitioners maintain that interpreting § 6 (d) to refer to determinations of national average weekly wage would render the provision duplicative of § 10 (f). Added by the 1972 Amendments, § 10 (f) provides:

"Effective October 1 of each year, the compensation or death benefits payable for permanent total disability or death arising out of injuries sustained after [October 27, 1972], shall be increased by a percentage equal to the percentage (if any) by which the applicable national weekly wage

1125, *supra,* at 5–6, Leg. Hist. 67–68   We conclude that § 6 (d) does not render the maximum limitations contained in § 6 (b) (1) applicable to death benefits.

for the period beginning on such October 1, as determined under section 6 (b), exceeds the applicable national average weekly wage, as so determined, for the period beginning with the preceding October 1."

This provision makes clear that, in cases of permanent total disability and death, benefits are adjusted upward each year that the national average wage rises. Although § 10 (f) gives the incremental increase in compensation payments to all beneficiaries in death and permanent total disability cases, including those unaffected by a statutory minimum or maximum, the incidental effect is partially to lift any ceiling and, to the same extent, any floor applicable to such benefits.

Although § 6 (d) and § 10 (f) overlap substantially, they are not entirely duplicative. The latter section applies only when benefits of a particular type are received in two consecutive years. If an employee receiving benefits for total and permanent disability in year 1 died in year 2, his survivors must look to § 6 (d) to determine whether the "applicable" national average weekly wage for purposes of computing minimum death benefits under § 9 (e) is the national average wage determined by the Secretary for year 1, when the employee's injury occurred, or that determined for year 2, when the employee died. For example, suppose that a covered worker was permanently and totally disabled in year 1. Suppose further that at the time of the injury his average weekly wages were $90 and that the national average weekly wage was $100. The worker would be entitled under § 8 (a) to disability benefits of $60 per week (66⅔% of $90), significantly more than the minimum payment of $50 per week (50% of $100) provided under § 6 (b) (2). If the worker died during the following year, leaving a widow and one or more children, his survivors would be entitled to death benefits amounting to 66⅔% of the national average weekly wage. 'Assuming the national average weekly wage had increased 5% in year 2, the question would arise whether the worker's survivors were entitled to death benefits calculated on the higher national average weekly wage. Reference to § 6 (d) reveals that the worker's widow and children, having been "newly awarded" death benefits during year 2, would be entitled to calculate their benefits on the higher national average weekly wage.

Further, the legislative history of the 1972 Amendments indicates that Congress was fully aware of the similarities between §§ 6 (d) and 10 (f).

## C

Finally, petitioners urge that, the Act's language and legislative history notwithstanding, Congress could not have intended to place a "premium on death." They cannot and do not dispute, however, that Congress did precisely that in situations in which the employee's average weekly wages are less than the applicable national average weekly wage and he is survived by a spouse and one or more children.[17] Congress

---

In its discussion of "maximum and minimum benefit amounts," the Senate Report accompanying S. 2318 states:

"The bill also requires an annual redetermination by the Secretary which will allow any increase in the national average weekly wage to be reflected by an appropriate increase in compensation payable under the Act. *A similar provision* for upgrading benefits in future years for cases of permanent total disability or death benefits is contained in section 10 of the Act (Section 11 of the bill)." S. Rep. No. 92–1125, pp. 5–6 (1972), Leg. Hist. 67–68 (emphasis added).

[17] A totally disabled employee is entitled to 66⅔% of his average weekly wages, 33 U. S. C. § 908 (a), or 50% of the national average weekly wage, 33 U. S. C. § 906 (b)(2), whichever is greater. If the disabled employee dies, however, his surviving spouse and children are entitled to no less than 66⅔% of the national average weekly wage or 100% of the deceased employee's average weekly wages, whichever is lesser. 33 U. S. C. § 909 (e). Thus, the death of a totally disabled employee whose average weekly wages were greater than half the national average weekly wage but less than the national average weekly wage would result in an increase in benefits payable under the Act. The Court of Appeals demonstrated this fact with the following examples:

"If we assume the Secretary has determined that the applicable national average weekly wage is $100, the compensation for an employee whose actual average weekly wage was $60 would be determined as follows:

"1. *Total Disability Benefits*

"Under [33 U. S. C.] § 908 (a) the employee would normally receive 66⅔ percent of his average weekly wage, or $40. However, § 906 (b)(2) states that the minimum compensation shall be 50 percent of the national average weekly wage, or $50. An employee in this situation would receive $50 compensation for total disability.

"2. *Death Benefits*

"Under [33 U. S. C.] § 909 (b), if, for example, the employee is survived by a widow or widower and one or more children, the total amount payable

may well have retained maximum benefit limitations in § 6 (b)(1) to discourage feigned disability, a consideration wholly inapplicable to death benefits. Nor is it inconceivable that the financial needs of the disabled worker's family could increase upon his death. The typical disabled worker, though no longer physically able to ply his trade, might be able to contribute to the family's livelihood by assuming a variety of domestic responsibilities, thus releasing his spouse into the work force. The disabled worker's death would under such circumstances rob the family of an economic asset.

Petitioners entreat us to interpret the 1972 Amendments "to avoid an absurd and discriminatory consequence." Even if we agreed with petitioners' characterization of Congress' failure to put a ceiling on death benefits, we would be required to decline petitioners' invitation, for our examination of the language and legislative history of the 1972 Amendments

---

is 66⅔ percent of the average weekly wage of the deceased, or $40. However, § 909 (e) states that where the average weekly wage is less than the national average weekly wage, the national average should be used in place of the employee's actual average, and here we should take 66⅔ percent of $100, or $66.66. § 909 (e) then limits this minimum compensation to the actual average weekly wage, so the survivors would receive $60 compensation.

"Making these same assumptions, the minimum compensation calculations for employees with average weekly wages greater than half the national average weekly wage and less than the national average weekly wage result in greater compensation for death than disability, as the following chart indicates:

| Nat'l. Avg. | Employee's Avg. | Death Benefits | Total Disability |
|---|---|---|---|
| $100 | $100 | $66.66 | $66.66 |
| 100 | 99 | 66.66 | 66.00 |
| 100 | 75 | 66.66 | 50.00 |
| 100 | 60 | 60.00 | 50.00 |
| 100 | 51 | 51.00 | 50.00 |
| 100 | 50 | 50.00 | 50.00" |

567 F. 2d, at 1390 n. 9.

convinces us that the omission was intentional. Congress has put down its pen, and we can neither rewrite Congress' words nor call it back "to cancel half a Line." Our task is to interpret what Congress has said; so doing, we conclude that death benefits payable under the Act are not subject to the maximum limitations contained in § 6 (b)(1). The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.