DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, DEPARTMENT OF LABOR *v.* NEWPORT
NEWS SHIPBUILDING & DRY DOCK CO. ET AL.

No. 93–1783.   Argued January 9, 1995—Decided March 21, 1995

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, *post*, p. 136.

*Beth S. Brinkmann* argued the cause for petitioner. With her on the briefs were *Solicitor General Days, Deputy Solicitor General Wallace, Allen H. Feldman, Steven J. Mandel,* and *Mark S. Flynn.*

*Lawrence P. Postol* argued the cause for respondents. With him on the brief was *James M. Mesnard.**

JUSTICE SCALIA delivered the opinion of the Court.

The question before us in this case is whether the Director of the Office of Workers' Compensation Programs in the United States Department of Labor has standing under § 21(c) of the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, to seek judicial review of decisions by the Benefits Review Board that in the Director's view deny claimants compensation to which they are entitled.

___

**Charles T. Carroll, Jr., Thomas D. Wilcox,* and *Dennis J. Lindsay* filed a brief for the National Association of Waterfront Employers et al. as *amici curiae* urging affirmance.

## I

On October 24, 1984, Jackie Harcum, an employee of respondent Newport News Shipbuilding and Dry Dock Co., was working in the bilge of a steam barge when a piece of metal grating fell and struck him in the lower back. His injury required surgery to remove a herniated disc, and caused prolonged disability. Respondent paid Harcum benefits under the LHWCA until he returned to light-duty work in April 1987. In November 1987, Harcum returned to his regular department under medical restrictions. He proved unable to perform essential tasks, however, and the company terminated his employment in May 1988. Harcum ultimately found work elsewhere, and started his new job in February 1989.

Harcum filed a claim for further benefits under the LHWCA. Respondent contested the claim, and the dispute was referred to an Administrative Law Judge (ALJ). One of the issues was whether Harcum was entitled to benefits for total disability, or instead only for partial disability, from the date he stopped work for respondent until he began his new job. "Disability" under the LHWCA means "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U. S. C. § 902(10).

After a hearing on October 20, 1989, the ALJ determined that Harcum was partially, rather than totally, disabled when he left respondent's employ, and that he was therefore owed only partial-disability benefits for the interval of his unemployment. On appeal, the Benefits Review Board affirmed the ALJ's judgment, and also ruled that under 33 U. S. C. § 908(f), the company was entitled to cease payments to Harcum after 104 weeks, after which time the LHWCA special fund would be liable for disbursements pursuant to § 944.

The Director petitioned the United States Court of Appeals for the Fourth Circuit for review of both aspects of the Board's ruling. Harcum did not seek review and, while not

opposing the Director's pursuit of the action, expressly declined to intervene on his own behalf in response to an inquiry by the Court of Appeals. The Court of Appeals *sua sponte* raised the question whether the Director had standing to appeal the Board's order. 8 F. 3d 175 (1993). It concluded that she did not have standing with regard to that aspect of the order denying Harcum's claim for full-disability compensation, since she was not "adversely affected or aggrieved" by that decision within the meaning of § 21(c) of the Act, 33 U. S. C. § 921(c).[1] We granted the Director's petition for certiorari. 512 U. S. 1287 (1994).

## II

The LHWCA provides for compensation of workers injured or killed while employed on the navigable waters or adjoining, shipping-related land areas of the United States. 33 U. S. C. § 903. With the exception of those duties imposed by §§ 919(d), 921(b), and 941, the Secretary of Labor has delegated all responsibilities of the Department with respect to administration of the LHWCA to the Director of the Office of Workers' Compensation Programs (OWCP). 20 CFR §§ 701.201 and 701.202 (1994); 52 Fed. Reg. 48466 (1987). For ease of exposition, the Director will hereinafter be referred to as the statutory recipient of those responsibilities.

A worker seeking compensation under the Act must file a claim with an OWCP district director. 33 U. S. C. § 919(a); 20 CFR §§ 701.301(a) and 702.105 (1994). If the district director cannot resolve the claim informally, 20 CFR § 702.311, it is referred to an ALJ authorized to issue a compensation order, § 702.316; 33 U. S. C. § 919(d). The ALJ's decision is reviewable by the Benefits Review Board, whose members are appointed by the Secretary. § 921(b)(1). The Board's

---

[1] The court found that, as administrator of the § 944 special fund, the Director did have standing to appeal the Board's decision to grant respondent relief under § 908(f). That ruling is not before us, and we express no view upon it.

decision is in turn appealable to a United States court of appeals, at the instance of "[a]ny person adversely affected or aggrieved by" the Board's order. § 921(c).

With regard to claims that proceed to ALJ hearings, the Act does not by its terms make the Director a party to the proceedings, or grant her authority to prosecute appeals to the Board, or thence to the federal courts of appeals. The Director argues that she nonetheless had standing to petition the Fourth Circuit for review of the Board's order, because she is a "person adversely affected or aggrieved" under § 921(c). Specifically, she contends the Board's decision injures her because it impairs her ability to achieve the Act's purposes and to perform the administrative duties the Act prescribes.

The phrase "person adversely affected or aggrieved" is a term of art used in many statutes to designate those who have standing to challenge or appeal an agency decision, within the agency or before the courts. See, *e. g.*, federal Communications Act of 1934, 47 U. S. C. § 402(b)(6); Occupational Safety and Health Act of 1970, 29 U. S. C. § 660(a); Federal Mine Safety and Health Act of 1977, 30 U. S. C. § 816. The terms "adversely affected" and "aggrieved," alone or in combination, have a long history in federal administrative law, dating back at least to the federal Communications Act of 1934, § 402(b)(2) (codified, as amended, 47 U. S. C. § 402(b)(6)). They were already familiar terms in 1946, when they were embodied within the judicial review provision of the Administrative Procedure Act (APA), 5 U. S. C. § 702, which entitles "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review. In that provision, the qualification "within the meaning of a relevant statute" is not an addition to what "adversely affected or aggrieved" alone conveys; but is rather an acknowledgment of the fact that what *constitutes* adverse effect or aggrievement varies from statute to statute. As the United States Department of Justice, At-

torney General's Manual on the Administrative Procedure Act (1947) put it, "The determination of who is 'adversely affected or aggrieved . . . within the meaning of any relevant statute' has 'been marked out largely by the gradual judicial process of inclusion and exclusion, aided at times by the courts' judgment as to the probable legislative intent derived from the spirit of the statutory scheme.'" *Id.*, at 96 (citation omitted). We have thus interpreted § 702 as requiring a litigant to show, at the outset of the case, that he is injured in fact by agency action and that the interest he seeks to vindicate is arguably within the "zone of interests to be protected or regulated by the statute" in question. *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150, 153 (1970); see also *Clarke* v. *Securities Industry Assn.,* 479 U. S. 388, 395–396 (1987).

Given the long lineage of the text in question, it is significant that counsel have cited to us no case, neither in this Court nor in the courts of appeals, neither under the APA nor under individual statutory-review provisions such as the present one, which holds that, without benefit of specific authorization to appeal, an agency, in its regulatory or policy-making capacity, is "adversely affected" or "aggrieved." Cf. *Director, Office of Workers' Compensation Programs* v. *Perini North River Associates,* 459 U. S. 297, 302–305 (1983) (noting the issue of whether the Director has standing under § 921(c), but finding it unnecessary to reach the question).[2]

---

[2] In addition to not reaching the § 921(c) question, *Perini* also took as a given (because it had been conceded below) the answer to another question: whether the Director (rather than the Benefits Review Board) is the proper party respondent to an appeal from the Board's determination. See 459 U. S., at 304, n. 13. Obviously, an agency's entitlement to party respondent status does not necessarily imply that agency's standing to appeal: The National Labor Relations Board, for example, is always the party respondent to an employer or employee appeal, but cannot initiate an appeal from its own determination. 29 U. S. C. §§ 152(1), 160(f). Indeed, it can be argued, as *amici* in this case have done, that if the Director *is* the proper party respondent in the court of appeals (as her

There are cases in which an agency has been held to be adversely affected or aggrieved in what might be called its nongovernmental capacity—that is, in its capacity as a member of the market group that the statute was meant to protect. For example, in *United States* v. *ICC*, 337 U. S. 426 (1949), we held that the United States had standing to sue the Interstate Commerce Commission (ICC) in federal court to overturn a Commission order that denied the Government recovery of damages for an allegedly unlawful railroad rate. The Government, we said, "is not less entitled than any other shipper to invoke administrative and judicial protection." *Id.*, at 430.[3] But the status of the Government as a statutory beneficiary or market participant must be sharply distinguished from the status of the Government as regulator or administrator.

The latter status would be at issue if—to use an example that continues the ICC analogy—the Environmental Protec-

---

regulations assert, see 20 CFR § 802.410 (1994)), in initiating an appeal she would end up on both sides of the case. See Brief for National Association of Waterfront Employers et al. as *Amici Curiae* 17, n. 14. Our opinion today intimates no view on the party-respondent question.

[3] *United States* v. *ICC* accorded the United States standing despite the facts that (1) the Interstate Commerce Act contained no specific judicial review provision, and (2) the APA's general judicial review provision ("person adversely affected or aggrieved") excludes agencies from the definition of "person." See *infra*, at 129. It would thus appear that an agency suing in what might be termed a nongovernmental capacity escapes that definitional limitation. The LHWCA likewise contains a definition of "person" that does not specifically include agencies. 33 U. S. C. § 902(1). We chose not to rely upon that provision in this opinion because it seemed more likely to sweep in the question of the Director's authority to appeal Board rulings that are adverse to the § 944 special fund, which deserves separate attention. It is possible that the Director's status as manager of the privately financed fund removes her from the "person" limitation, just as it may remove her from the more general limitation that agencies *qua* agencies are not "adversely affected or aggrieved." We leave those issues to be resolved in a case where the Director's relationship to the fund is immediately before us.

tion Agency sued to overturn an ICC order establishing high tariffs for the transportation of recyclable materials. Cf. *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669 (1973). Or if the Department of Transportation, to further a policy of encouraging so-called "telecommuting" in order to reduce traffic congestion, sued as a "party aggrieved" under 28 U. S. C. § 2344, to reverse the Federal Communications Commission's approval of rate increases on second phone lines used for modems. We are aware of no case in which such a "policy interest" by an agency has sufficed to confer standing under an "adversely affected or aggrieved" statute or any other general review provision. To acknowledge the general adequacy of such an interest would put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes—a role that would be most inappropriate.

That an agency in its governmental capacity is not "adversely affected or aggrieved" is strongly suggested, as well, by two aspects of the United States Code: First, the fact that the Code's general judicial review provision, contained in the APA, does not include agencies within the category of "person adversely affected or aggrieved." See 5 U. S. C. § 551(2) (excepting agencies from the definition of "person"). Since, as we suggested in *United States* v. *ICC*, the APA provision reflects "the general legislative pattern of administrative and judicial relationships," 337 U. S., at 433–434, it indicates that even under specific "adversely affected or aggrieved" statutes (there were a number extant when the APA was adopted) agencies as such normally do not have standing. And second, the United States Code displays throughout that when an agency in its governmental capacity *is* meant to have standing, Congress says so. The LHWCA's silence regarding the Secretary's ability to take an appeal is significant when laid beside other provisions of law. See, *e. g.*, Black Lung Benefits Act (BLBA), 30 U. S. C. § 932(k) ("The Secretary shall be a party in any proceeding

relative to [a] claim for benefits"); Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(f)(1) (authorizing the Attorney General to initiate civil actions against private employers) and § 2000e–4(g)(6) (authorizing the Equal Employment Opportunities Commission to "intervene in a civil action brought . . . by an aggrieved party . . ."); Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1132(a)(2) (granting Secretary power to initiate various civil actions under the Act). It is particularly illuminating to compare the LHWCA with the Occupational Safety and Health Act of 1970 (OSHA), 29 U. S. C. § 651 *et seq.* Section 660(a) of OSHA is virtually identical to § 921(c): It allows "[a]ny person adversely affected or aggrieved" by an order of the Occupational Safety and Health Review Commission (a body distinct from the Secretary, as the Benefits Review Board is) to petition for review in the courts of appeals. OSHA, however, further contains a § 660(b), which expressly grants such petitioning authority to the Secretary—suggesting, of course, that the Secretary would *not* be considered "adversely affected or aggrieved" under § 660(a), and should not be considered so under § 921(c).

All of the foregoing indicates that the phrase "person adversely affected or aggrieved" does not refer to an agency acting in its governmental capacity. Of course the text of a particular statute could make clear that the phrase is being used in a peculiar sense. But the Director points to no such text in the LHWCA, and relies solely upon the mere existence and impairment of her governmental interest. If that alone could ever suffice to contradict the normal meaning of the phrase (which is doubtful), it would have to be an interest of an extraordinary nature, extraordinarily impaired. As we proceed to discuss, that is not present here.

### III

The LHWCA assigns four broad areas of responsibility to the Director: (1) supervising, administering, and making

rules and regulations for calculation of benefits and processing of claims, 33 U. S. C. §§ 906, 908–910, 914, 919, 930, and 939; (2) supervising, administering, and making rules and regulations for provision of medical care to covered workers, § 907; (3) assisting claimants with processing claims and receiving medical and vocational rehabilitation, § 939(c); and (4) enforcing compensation orders and administering payments to and disbursements from the special fund established by the Act for the payment of certain benefits, §§ 921(d) and 944. The Director does not assert that the Board's decision hampers her performance of these express statutory responsibilities. She claims only two categories of interest that are affected, neither of which remotely suggests that she has authority to appeal Board determinations.

· First, the Director claims that because the LHWCA "has many of the elements of social insurance, and as such is designed to promote the public interest," Brief for Petitioner 17, she has standing to "advance in federal court the public interest in ensuring adequate compensation payments to claimants," *id.*, at 18. It is doubtful, to begin with, that the goal of the LHWCA is simply the support of disabled workers. In fact, we have said that, because "the LHWCA represents a compromise between the competing interests of disabled laborers and their employers," it "is not correct to interpret the Act as guaranteeing a completely adequate remedy for all covered disabilities." *Potomac Elec. Power Co.* v. *Director, Office of Workers' Compensation Programs,* 449 U. S. 268, 282 (1980). The LHWCA is a scheme for fair and efficient resolution of a class of private disputes, managed and arbitered by the Government. It represents a "quid pro quo *between employer and employee.* Employers relinquish certain legal rights which the law affords to them and so, in turn, do the employees." 1 M. Norris, The Law of Maritime Personal Injuries § 4.1, p. 106 (4th ed. 1990) (emphasis added).

But even assuming the single-minded, compensate-the-employee goal that the Director posits, there is nothing to suggest that the Director has been given authority to pursue that goal in the courts. Agencies do not automatically have standing to sue for actions that frustrate the purposes of their statutes. The Interior Department, being charged with the duty to "protect persons and property within areas of the National Park System," 16 U. S. C. § 1a–6(a), does not thereby have authority to intervene in suits for assault brought by campers; or (more precisely) to bring a suit for assault when the camper declines to do so. What the Director must establish here is such a clear and distinctive responsibility for employee compensation as to overcome the universal assumption that "person adversely affected or aggrieved" leaves private interests (even those favored by public policy) to be litigated by private parties. That we are unable to find. The Director is not the designated champion of employees within this statutory scheme. To the contrary, one of her principal roles is to serve as the broker of informal settlements between employers and employees. 33 U. S. C. § 914(h). She is charged, moreover, with providing "information and assistance" regarding the program to *all* persons covered by the Act, including employers. §§ 902(1), 939(c). To be sure, she has discretion under § 939(c) to provide "legal assistance in processing a claim" if it is requested (a provision that is perhaps of little consequence, since the Act provides attorney's fees to successful claimants, see § 928); but that authority, which is discretionary with her and contingent upon a request by the claimant, does not evidence the duty and power, when the claimant is satisfied with his award, to contest the award on her own.

The Director argues that her standing to pursue the public's interest in adequate compensation of claimants is supported by our decisions in *Heckman* v. *United States*, 224 U. S. 413 (1912), *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463 (1976), *Pasa-*

*dena City Bd. of Ed.* v. *Spangler,* 427 U. S. 424 (1976), and *General Telephone Co. of Northwest* v. *EEOC,* 446 U. S. 318 (1980). Brief for Petitioner 18. None of those cases is apposite. *Heckman* and *Moe* pertain to the United States' standing to represent the interests of Indians; the former holds, see 224 U. S., at 437, and the latter indicates in dictum, see 425 U. S., at 474, n. 13, that the Government's status as guardian confers standing. The third case, *Spangler, supra,* at 427, based standing of the United States upon an explicit provision of Title IX of the Civil Rights Act of 1964 authorizing suit, 42 U. S. C. § 2000h–2, and the last, *General Telephone Co., supra,* at 325, based standing of the Equal Employment Opportunity Commission (EEOC) upon a specific provision of Title VII of the Civil Rights Act of 1964 authorizing suit, 42 U. S. C. § 2000e–5(f)(1). Those two cases certainly establish that Congress *could* have conferred standing upon the Director without infringing Article III of the Constitution; but they do not at all establish that Congress did so. In fact, *General Telephone Co.* suggests just the opposite, since it describes how, prior to the 1972 amendment specifically giving the EEOC authority to sue, only the "aggrieved person" could bring suit, *even though* the EEOC *was* authorized to use "'informal methods of conference, conciliation, and persuasion'" to eliminate unlawful employment practices, 446 U. S., at 325—an authority similar to the Director's informal settlement authority here.

The second category of interest claimed to be affected by erroneous Board rulings is the Director's ability to fulfill "important administrative and enforcement responsibilities." Brief for Petitioner 18. The Director fails, however, to identify any specific statutory duties that an erroneous Board ruling interferes with, reciting instead conjectural harms to abstract and remote concerns. She contends, for example, that "incorrect claim determinations by the Board frustrate [her] duty to administer and enforce the statutory scheme in a uniform manner." *Id.,* at 18–19. But it is impossible to

understand how a duty of uniform *administration* and *enforcement* by the Director (presumably arising out of the prohibition of arbitrary action reflected in 5 U. S. C. § 706) hinges upon correct *adjudication* by someone else. The Director does not (and we think cannot) explain, for example, how an erroneous decision by the Board affects her ability to process the underlying claim, § 919, provide information and assistance regarding coverage, compensation, and procedures, § 939(c), enforce the final award, § 921(d), or perform any other required task in a "uniform" manner.

If the correctness of adjudications were essential to the Director's performance of her assigned duties, Congress would presumably have done what it has done with many other agencies: made adjudication *her* responsibility. In fact, however, it has taken pains to *remove* adjudication from her realm. The LHWCA Amendments of 1972, 86 Stat. 1251, assigned administration to the Director, 33 U. S. C. § 939(a); assigned initial adjudication to ALJ's, § 919(d); and created the Board to consider appeals from ALJ decisions, § 921. The assertion that proper adjudication is essential to proper performance of the Director's functions is quite simply contrary to the whole structure of the Act. To make an implausible argument even worse, the Director must acknowledge that her lack of control over the adjudicative process does not even deprive her of the power to resolve legal ambiguities in the statute. She retains the rulemaking power, see § 939(a), which means that if her problem with the present decision of the Board is that it has established an erroneous rule of law, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), she has full power to alter that rule. See *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992) ("[T]he [Board] is not entitled to any special deference"). Her only possible complaint, then, is that she does not agree with the outcome of this particular case. The Director also claims that precluding her from seeking review of erroneous Board rulings "would reduce

the incentive for employers to view the Director's informal resolution efforts as authoritative, because the employer could proceed to a higher level of review from which the Director could not appeal." Brief for Petitioner 19. This argument assumes that her informal resolution efforts are *supposed* to be "authoritative." We doubt that. The structure of the statute suggests that they are supposed to be facilitative—a service to both parties, rather than an imposition upon either of them. But even if the opposite were true, we doubt that the unlikely prospect that the Director will appeal *when the claimant does not* will have much of an impact upon whether the employer chooses to spurn the Director's settlement proposal and roll the dice before the Board. The statutory requirement of adverse effect or aggrievement must be based upon "something more than an ingenious academic exercise in the conceivable." *United States* v. *SCRAP*, 412 U. S., at 688.

The Director seeks to derive support for her position from Congress' later enactment of the BLBA in 1978, but it seems to us that the BLBA militates precisely *against* her position. The BLBA expressly provides that "[t]he Secretary shall be a party in any proceeding relative to a claim for benefits under this part." 30 U. S. C. § 932(k). The Director argues that since the Secretary is explicitly made a party under the BLBA, she must be meant to be a party under the LHWCA as well. That is not a form of reasoning we are familiar with. The normal conclusion one would derive from putting these statutes side by side is this: When, in a legislative scheme of this sort, Congress wants the Secretary to have standing, it says so.

Finally, the Director retreats to that last redoubt of losing causes, the proposition that the statute at hand should be liberally construed to achieve its purposes, see, *e. g., Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249, 268 (1977). That principle may be invoked, in case of ambiguity, to find present rather than absent elements that are essential

to operation of a legislative scheme; but it does not add features that will achieve the statutory "purposes" more effectively. Every statute purposes, not only to achieve certain ends, but also to achieve them by particular means—and there is often a considerable legislative battle over what those means ought to be. The withholding of agency authority is as significant as the granting of it, and we have no right to play favorites between the two. Construing the LHWCA as liberally as can be, we cannot find that the Director is "adversely affected or aggrieved" within the meaning of § 921(c).

*　　*　　*

For these reasons, the judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.

*So ordered.*

JUSTICE GINSBURG, concurring in the judgment.

The Court holds that the Director of the Office of Workers' Compensation Programs of the United States Department of Labor (OWCP) lacks standing under § 21(c) of the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, to seek judicial review of LHWCA claim determinations. Before amendment of the LHWCA in 1972, the Act's administrator had authority to seek review of LHWCA claim determinations in the courts of appeals. The Court reads the 1972 amendments as divesting the Act's administrator of access to federal appellate tribunals formerly open to the administrator's petitions. The practical effect of the Court's ruling is to order a disparity between two compensatory schemes— the LHWCA and the Black Lung Benefits Act (BLBA), 83 Stat. 792, as amended, 30 U. S. C. § 901 *et seq.*—measures that Congress intended to work in essentially the same way.

Significantly, however, the Court observes that our precedent "certainly establish[es] that Congress *could* have con-

ferred standing upon the [OWCP] Director without infringing Article III of the Constitution." *Ante,* at 133 (emphasis in original).[1] While I do not challenge the Court's conclusion that the Director lacks standing under the amended Act, I write separately because I am convinced that Congress did not advert to the change—the withdrawal of the LHWCA administrator's access to judicial review—wrought by the 1972 LHWCA amendments. Since no Article III impediment stands in its way, Congress may speak the final word by determining whether and how to correct its apparent oversight.

I

Before the 1972 amendments to the LHWCA, the OWCP Director's predecessors as administrators of the Act, officials called OWCP deputy commissioners, adjudicated LHWCA claims in the first instance. 33 U. S. C. §§ 919, 923 (1970 ed.); see *Kalaris* v. *Donovan,* 697 F. 2d 376, 381–382 (CADC), cert. denied, 462 U. S. 1119 (1983). A deputy commissioner's claim determination could be challenged in federal district court in an injunctive action against the deputy commissioner. 33 U. S. C. § 921(b) (1970 ed.); see *Parker* v. *Motor Boat Sales, Inc.,* 314 U. S. 244, 245 (1941). As a defending party in district courts, the deputy commissioner could appeal adverse rulings to the courts of appeals pursuant to 28 U. S. C. § 1291, even when no other party sought appeal. See *Henderson* v. *Glens Falls Indemnity Co.,* 134 F. 2d 320, 322 (CA5 1943) ("There are numerous cases in which the deputy commissioner has appealed as the sole party, and his

---

[1] In contrast, the Court of Appeals for the Fourth Circuit raised the standing issue in this case on its own motion because it feared that judicial review initiated by the Director would "strik[e] at the core of the constitutional limitations placed upon th[e] court by Article III of the Constitution." 8 F. 3d 175, 180, n. 1 (1993); see also *Director, Office of Workers' Compensation Programs* v. *Perini North River Associates,* 459 U. S. 297, 302–305 (1983) (noting but not deciding Article III issue).

right to appeal has never been questioned.") (citing, *inter alia, Parker, supra*).

The 1972 LHWCA amendments shifted the deputy commissioners' adjudicatory authority to Department of Labor administrative law judges (ALJ's). Although district directors—as deputy commissioners are now called[2]—are empowered to investigate LHWCA claims and attempt to resolve them informally, they must order a hearing before an ALJ upon a party's request. 33 U. S. C. § 919. The 1972 amendments also replaced district court injunctive actions with appeals to the newly created Benefits Review Board. Just as the deputy commissioners were parties before district courts prior to 1972, the Director—as the Secretary's delegate—is a party before the Benefits Review Board under the current scheme. 20 CFR § 801.2(a)(10) (1994). Either the Director or another party may invoke Board review of an ALJ's decision. 33 U. S. C. § 921(b)(3); 20 CFR §§ 801.102, 801.2(a)(10) (1994). As before the amendments, further review is available in the courts of appeals. 33 U. S. C. § 921(c).

The Court holds that the LHWCA, as amended in 1972, does not entitle the Director to appeal Benefits Review Board decisions to the courts of appeals. Congress surely decided to transfer adjudicative functions from the deputy commissioners to ALJ's, and from the district courts to the Benefits Review Board. But there is scant reason to believe that Congress consciously decided to strip the Act's administrator of authority that official once had to seek judicial review of claim determinations adverse to the administrator's position. In amending the LHWCA in 1972, Congress did not expressly address the standing of the Secretary of Labor or his delegate to petition for judicial review. Congress did use the standard phrase "person adversely affected or aggrieved" to describe proper petitioners to the courts of appeals. See 33 U. S. C. § 921(c). But it is doubtful that Con-

---

[2] 20 CFR §§ 701.301(a)(7), 702.105 (1994).

gress comprehended the full impact of that phrase: Not only does it qualify employers and injured workers to seek judicial review but, as interpreted, it ordinarily disqualifies agencies acting in a governmental capacity from petitioning for court review.[3]

## II

Congress' 1978 revision of the BLBA reveals the judicial review design Congress ordered when it consciously attended to this matter. The 1978 BLBA amendments were adopted, in part, to keep adjudication of BLBA claims under the same procedural regime as the one Congress devised for LHWCA claims. In the 1978 BLBA prescriptions, Congress expressly provided for the party status of the OWCP Director. See 30 U. S. C. § 932(k) ("The Secretary [of Labor] shall be a party in any proceeding relative to a claim for [black lung] benefits.").

Congress enacted the BLBA in 1969 to afford compensation to coal miners and their survivors for death or disability caused by pneumoconiosis (black lung disease). See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 8 (1976). The BLBA generally adopts the claims adjudication scheme of the LHWCA. 30 U. S. C. § 932(a). Congress amended the BLBA in 1978 to clarify that the BLBA *continuously* incorporates LHWCA claim adjudication procedures. See § 7(a)(1), 92 Stat. 98 (amending BLBA to incorporate LHWCA "as it may be amended from time to time"); S. Rep. No. 95–209, p. 18 (1977) (BLBA amendment "makes clear that any and all amendments to the [LHWCA]" are incorporated by the BLBA, including "the 1972 amendments relating to the use of Administrative Law Judges in claims adjudication").

---

[3] The law-presentation role OWCP's Director seeks to play might be compared with the role of an advocate general or *ministère public* in civil law proceedings. See generally M. Glendon, M. Gordon, & C. Osakwe, Comparative Legal Traditions 344 (2d ed. 1994); R. David, French Law 59 (1972).

In the context of assuring automatic application of LHWCA procedures to black lung claims, see H. R. Conf. Rep. No. 95–864, pp. 22–23 (1978), Congress added to the BLBA the provision for the Secretary of Labor's party status "in any proceeding relative to a claim for [black lung] benefits." See § 7(k), 92 Stat. 99. According to the Report of the Senate Committee on Human Resources:

> "Some question has arisen as to whether the adjudication procedures applicable to black lung claims incorporating various sections of the amended [LHWCA] confe[r] standing upon the Secretary of Labor or his designee to appear, present evidence, file appeals or respond to appeals filed with respect to the litigation and appeal of claims. *In establishing the [LHWCA] procedures it was the intent of this Committee to afford the Secretary the right to advance his views in the formal claims litigation context whether or not the Secretary had a direct financial interest in the outcome of the case.* The Secretary's interest as the officer charged with the responsibility for carrying forth the intent of Congress with respect to the [BLBA] should be deemed sufficient to confer standing on the Secretary or such designee of the Secretary who has the responsibility for the enforcement of the [BLBA], to actively participate in the adjudication of claims before the Administrative Law Judge, Benefits Review Board, and appropriate United States Courts." S. Rep. No. 95–209, *supra*, at 21–22 (emphasis added).

Even if this passage cannot force an uncommon reading of the LHWCA words "person adversely affected or aggrieved," see *ante*, at 130, it strongly indicates that Congress considered vital to sound administration of the Act the administrator's access to court review.

The Director has been a party before this Court in nine argued cases involving the LHWCA.[4] In two of these cases,[5] the Director was a petitioner in the Court of Appeals. As this string of cases indicates, the impact of the 1972 amendments on the Director's *statutory* standing generally escaped this Court's attention just as it apparently slipped from Congress' grasp.

## III

In addition to the BLBA, four other Federal Acts incorporate the LHWCA's claim adjudication procedures. See Defense Base Act, 42 U. S. C. § 1651; District of Columbia Workmen's Compensation Act, 36 D. C. Code Ann. § 501 (1973);[6] Outer Continental Shelf Lands Act, 43 U. S. C. § 1333(b); Employees of Nonappropriated Fund Instrumentalities Statute, 5 U. S. C. § 8171. Claims under the LHWCA, the BLBA, and these other Acts are handled by the same administrative

[4] *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267 (1994); *Bath Iron Works Corp.* v. *Director, Office of Workers' Compensation Programs*, 506 U. S. 153 (1993); *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469 (1992); *Morrison-Knudsen Constr. Co.* v. *Director, Office of Workers' Compensation Programs*, 461 U. S. 624 (1983); *Director, Office of Workers' Compensation Programs* v. *Perini North River Associates*, 459 U. S. 297 (1983); *U. S. Industries/Fed. Sheet Metal, Inc.* v. *Director, Office of Workers' Compensation Programs*, 455 U. S. 608 (1982); *Potomac Elec. Power Co.* v. *Director, Office of Workers' Compensation Programs*, 449 U. S. 268 (1980); *Director, Office of Workers' Compensation Programs* v. *Rasmussen*, 440 U. S. 29 (1979); *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977).

[5] *Morrison-Knudsen Constr. Co.* v. *Director, Office of Workers' Compensation Programs*, 461 U. S. 624 (1983); *Director, Office of Workers' Compensation Programs* v. *Rasmussen*, 440 U. S. 29 (1979). In neither of these cases did the Board's ruling affect the § 944 special fund. See *ante*, at 128, n. 3.

[6] This law "applies to all claims for injuries or deaths based on employment events that occurred prior to July 2[4], 1982, the effective date of the District of Columbia Workers' Compensation Act [36 D. C. Code Ann. § 36–301 *et seq.* (1981)]." 20 CFR § 701.101(b) (1994).

actors: the OWCP Director, district directors, ALJ's, and the Benefits Review Board. Because the same procedures generally apply in the administration of these benefits programs, common issues arise under the several programs. See, *e. g., Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries,* 512 U. S. 267, 281 (1994) (invalidating "true doubt" burden of persuasion rule that Department of Labor ALJ's applied in both LHWCA and BLBA claim adjudications).

Under the Court's holding, the Director can appeal the Benefits Review Board's resolution of a BLBA claim, but not the Board's resolution of an identical issue presented in a claim under the LHWCA or the other four Acts. I concur in the Court's judgment despite the disharmony it establishes and my conviction that Congress did not intend to put the administration of the BLBA and the LHWCA out of sync. Correcting a scrivener's error is within this Court's competence, see, *e. g., United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.,* 508 U. S. 439 (1993), but only Congress can correct larger oversights of the kind presented by the OWCP Director's petition.