### John A. NICHOLS, Appellant Below, Appellant,

v.

### STATE COASTAL ZONE INDUSTRIAL CONTROL BOARD, Delaware Department of Natural Resources and Environmental Control, and Diamond State Generation Partners, LLC, Appellees–Below, Appellees.

### No. 190, 2013.

Supreme Court of Delaware.

Submitted: July 24, 2013.
Decided: Aug. 16, 2013.

---

6. *Id.* at 624.

7. *Id.*

Richard L. Abbott, Esquire, Abbott Law Firm, Hockessin, Delaware, for appellant.

Robert F. Phillips, Esquire, Department of Justice, Wilmington, Delaware, for appellee, Delaware Department of Natural Resources and Environmental Control.

Joseph C. Schoell, Esquire and Shawn P. Tucker, Esquire, Drinker, Biddle & Reath, LLP, Wilmington, Delaware, for appellee, Diamond State Generation Partners, LLC.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

HOLLAND, Justice:

The appellant, John Nichols ("Nichols"), appeals from a final judgment of the Superior Court affirming the order of the State Coastal Zone Industrial Board (the "Board"), granting motions to dismiss filed by appellees, Diamond State Generation Partners LLC ("DSGP") and the Delaware Department of Natural Resources and Environmental Control ("DNREC" and with DSGP, "appellees"), in response to Nichols' appeal of the grant of a Coastal Zone industrial permit application.

Nichols raises two claims on appeal. First, he argues that the Board's vote on whether Nichols had standing to pursue the appeal failed due to the lack of a five-vote majority. Second, Nichols contends that he possessed standing under the "any person aggrieved" standard of title 7, section 7007(b) of the Delaware Code, or, in the alternative, as a matter of common law.

We have determined that both of Nichols' arguments are without merit. Therefore, the judgment of the Superior Court must be affirmed.

### Facts and Procedural History

In November, 2011, DSGP submitted a written application for a Coastal Zone Act ("CZA")[1] permit to develop and operate a facility, known as the Red Lion Energy Center, that would utilize "Bloom Boxes" to generate electricity in the Coastal Zone of Delaware. The manufacturing process to be employed involved the use of fuel cells, which would "chemically convert natural gas to electrical power."[2] The Secretary of DNREC issued an Environmental Assessment Report (the "Report") describing the project and its purpose, and found the application to be administratively complete. The Report also stated multiple benefits of the project and that "no hazardous wastes" would be generated from the facility.

In March, 2012, the Secretary of DNREC, through a hearing officer, held a public hearing to receive public comment on the proposed permit. Nichols appeared and raised several objections to the permit. Specifically, Nichols questioned whether DSGP's application disclosed all materials that could be hazardous, and brought attention to the fact that the application failed to include an Environmental Assessment Report from DNREC's Natural Heritage Program, as required by CZA Regulations. The hearing officer issued a report recommending granting the CZA permit over the objections of Nichols, and the Secretary issued the permit.

Nichols appealed the order granting the permit, citing five reasons why the ruling should be overturned.[3] In response, DSGP, joined by DNREC, filed a motion to dismiss Nichols' appeal based on lack of standing. The appellees argued that Nichols failed to show that he was an "aggrieved" person under title 7, section 7007(b). Nichols raised two arguments in response to DSGP's motion to dismiss. First, he argued that he was acting on behalf of the "nesting birds and other flora and fauna, which were unable to file an appeal." Second, he argued that his interest was the "public interest in a thorough, fact-based administrative determination before a Coastal Zone permit is issued."

A hearing was held (the "Hearing") before the Coastal Zone Industrial Control Board to address Nichols' appeal. At the Hearing, Nichols declined to be sworn in and present testimony, but relied solely on the arguments advanced in his response to

1. The Coastal Zone Act is codified in Chapter 70 of Title 7 of the Delaware Code.

2. The total land affected by the project development was 9.3 acres and the sanitary wastewater sewage was to be disposed of by the use of an underground septic system.

3. *Nichols v. State Coastal Zone Indus. Control Bd.*, 2013 WL 1092205, at *1 (Del.Super.Ct. Mar. 19, 2003) (citing the following issues that were raised on appeal: "(1) the Secretary's Order incorrectly referenced the public hearing date; (2) the hearing officer failed to consider Nichols' comments at the public hearing; (3) a report from DNREC's Natural Heritage Program was missing; (4) the hearing officer did not consider the environmental hazards of the facility; and (5) DSGP incorrectly calculated the efficiency and environmental impacts of the facility.").

DSGP's motion to dismiss and the testimony of expert witnesses he called to testify. Nichols contended that the term "aggrieved" in section 7007(b) referred to "any person who simply thinks that DNREC got it wrong" and that "[g]rievance is based on ... state of mind." The Board deferred ruling on the issue of Nichols' standing until after the evidentiary portion of the Hearing. At the conclusion of the Hearing, five of the seven board members present voted to dismiss Nichols' appeal for lack of standing, while the other two abstained.

The Board issued its Final Opinion and Order, in which it memorialized the members' votes and granted the motion to dismiss for lack of standing, reasoning that Nichols had "not identified or presented any evidence relating to any legally protected interest that he possesses that has been or will be invaded upon by the permit issued to Diamond State." The Board further found that Nichols failed to connect the potential injury to the flora and fauna and his own legally protected interests, and "presented no evidence whatsoever that might be relevant to his standing to bring the present appeal."

The Superior Court affirmed the decision of the Board, reasoning that Nichols failed to present any evidence that would prove his own legally protected interests were infringed upon by the order and that the record clearly and correctly reflected that "five members of the Board voted that Nichols lacked standing." The Superior Court also found that Nichols' challenge to the Board's method of voting on standing was not objected to at the Hearing and was raised for the first time in his opening brief to the Superior Court.

Therefore, the Superior Court held that argument was waived and could not be considered.

### Board Majority Votes on Standing

Title 7, section 7006 states, in relevant part: "A majority of the total membership of the Board less those disqualifying themselves shall constitute a quorum. A majority of the total membership of the Board shall be necessary to make a final decision on a permit request." Nichols argues that the transcript of the hearing reveals that the Board failed to achieve the majority vote required by title 7, section 7006 to render a binding decision. According to Nichols, only four of the nine members of the Board actually voted.

The Superior Court did not consider whether or not a majority of the Board properly voted that Nichols lacked standing. The Superior Court determined that Nichols waived this argument by not objecting to the sufficiency or procedural propriety of the vote at the Hearing. Nichols argues that he had "no chance" to object to the alleged invalid board vote, as the Chairman immediately adjourned the Board Hearing after the vote. However, the transcript of the Hearing shows that counsel for DNREC requested and obtained a clarification from the Chairman that five members had voted in favor of dismissing Nichols' appeal for lack of standing, before adjournment of the Hearing. Nichols offers no reason as to why he could not have objected or requested a re-vote at that time.[4]

■ Generally, issues not presented to the Board will not be considered for the first time on appeal—in the Superior Court or in this Court.[5] Nevertheless, this

4. DSGP also notes that a transcript of the Hearing was made available to all parties three weeks before the Board issued the final order, yet Nichols never questioned the suffi- ciency of the vote until he filed his opening brief with the Superior Court.

5. *See* Del.Supr. Ct. R. 8; *Day & Zimmerman Sec. v. Simmons*, 965 A.2d 652, 658 (Del.

Court has stated that "[w]here the interests of justice require, this Court may choose to adjudicate a question not fairly presented at [the hearing]."[6] In this case, we will address the merits of Nichols' argument regarding the Board's vote that he lacked standing.

■ The crux of Nichols' argument on appeal is that the Board did not garner sufficient votes (5) at the Hearing to dismiss Nichols' appeal for lack of standing. Accordingly, a recitation of the pertinent portion of the Hearing transcript is instructive.

Mr. Subramanian: I don't want to work on the standing yet. But I think they brought up a lot of points. For that I want to thank them. A lot of education. But with that aspect of it is the particular purpose of the meeting, that's what we had to think about. We are charged with acting on the Secretary's decision. So for that standing, I don't think he has that standing for that. But for education, yes, very good. We thank him for that.

Chairman Legatski: Yes. I agree and I think we all do this. There has been a lot of good and mostly pertinent information put in front of us. And still that doesn't get to the dispositive question, the question of standing, and at this point I'd like to poll the Board on whether you vote that Mr. Nichols does or does not have standing. I will start with Mr. Wheatley.

Mr. Wheatley: No standing.

Mr. Holmes: No standing.

Mr. Burton: At this point can I say a little something also as the reason I'm voting this way?

Chairman Legatski: Okay.

Mr. Burton: I expressed some concerns here today, as you people expressed a lot of concerns. Maybe at the first meeting, the first hearing it might have been a different story. We're really here as to whether we're going to uphold a Secretary's decision. Different safety things and I tried to sneak a few things in like the power and after personally observing the location in question, I find everything in order with the exception that, like I stated, there was a few, three houses. And to relieve some people's minds, this is not setting on the river. It's at least a mile away from the river. Very close to wetlands, but there's a mile of wetlands, maybe a mile and a half. I want to make that point. So I have not heard any evidence that would justify the Secretary's order being overturned. I, John S. Burton, Sr., do hereby vote to uphold the Honorable Secretary's ... Order. I vote to uphold it.

Chairman Legatski: Thank you.... We're still working on the vote of the question.

Mr. Burton: On the standing, I don't sustain the appeal.

Chairman Legatski: You're voting he does not have standing?

Mr. Burton: Right. He doesn't. Because that's not the issue.

Mr. Bewick: I'm not voting on standing because I don't think it has anything to do with the decision that I want to make.

Chairman Legatski: You will abstain?

Mr. Bewick: I'm abstaining on standing.

Mr. Tocker: I'm abstaining also.

2008); *Tatten Partners, L.P. v. New Castle County Bd. of Assessment Review,* 642 A.2d 1251, 1262 (Del.Super.1993).

6. *Day & Zimmerman Sec. v. Simmons,* 965 A.2d at 658.

Chairman Legatski: That's four—I am not inclined to support standing. I have heard a lot of interesting information, but as far as the particular identifiable harm, standing which I'm paraphrasing, I have not been persuaded that Mr. Nichols has standing. **That leaves us with a vote of 5 to 1.** (emphasis added). That is the end of the hearing. Thank you all for your participation and your patience.

Mr. Phillips: I'm not sure that the vote was properly recorded. I have one, two, three—

Chairman Legatski: **Mr. Subramanian voted.** (emphasis added).

Mr. Phillips:—four votes, **five votes saying there was no standing.** (emphasis added).

Chairman Legatski: **That's correct.** (emphasis added).

Mr. Phillips: And two abstentions?

Chairman Legatski: Yes.

Mr. Phillips: Okay. I wasn't clear on that. Thank you.

The meeting was adjourned.

Nichols argues that, because Mr. Subramanian—one of the five members voting—stated, "I don't want to work on standing yet," that he failed to vote. But, immediately after making that statement, Mr. Subramanian stated "[s]o for that standing, I don't think [Nichols] has that standing." The emphasized portions of the hearing transcript make clear that Chairman Legatski was counting that statement by Subramanian as a vote to deny Nichols' standing.

At the Hearing, Chairman Legatski clearly stated that there were "five votes saying there was no standing." No one—

in particular, Mr. Subramanian—challenged the recording of that vote. This is significant because the end of the Hearing was specifically reserved to address and vote on the issue of standing. The only reasonable reading of the Board's Hearing transcript is that five Board members—Subramanian, Wheatley, Holmes, Burton, and Legatski—voted to deny Nichols' appeal because he lacked standing.

The Board's Opinion and Final Order is additional evidence as to the vote taken at the Hearing. At the Hearing, the Board chairman announced that five members were voting that Nichols did not have standing on appeal to contest the CZA Permit. Nevertheless, pursuant to title 19, section 10128(b), the Board was subsequently required to reduce this to writing.[7] The Opinion and Final Order of the Board was signed by Legatski, Wheatley, Holmes, Burton, Subramanian, and Tocker. That subsequent writing by the Board further demonstrates a five member majority of the Board voted that Nichols lacked standing to appeal.

### Standing Requirement Under the Coastal Zone Act

In anticipation of our holding that a five member majority of the Board voted to dismiss, Nichols also challenges the substantive decision of the Board to deny him standing. Nichols' argues that the Board, and subsequently the Superior Court, misapplied the CZA standing requirement in two ways. First, Nichols asserts that the Superior Court erred in applying the test adopted by this Court in *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.,*[8] because that test was based on statutory language wholly inapplicable to the instant action. Second, Nichols argues that the

---

7. *See* Del.Code Ann. tit. 19, § 10128(b) (stating that "[e]very case decision ... shall be incorporated in an final order.").

8. *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,* 636 A.2d 892 (Del.1994).

Superior Court erred in applying common law standing requirements.

Any right Nichols has to appeal the decision of the Secretary of DNREC to grant the CZA Permit is derived from title 7, section 7007 of the Delaware Code. Section 7007(b) states that "[a]ny person aggrieved by a final decision of the Secretary of [DNREC] under § 7005(a) of this title may appeal same under this section." The important term in section 7007(b) is "aggrieved." All parties agree that the term is not defined in the Coastal Zone Act (title 7, section 7001 *et seq.*) and has never been construed by this Court.

The Superior Court relied upon this Court's decision in *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.,* to define standing in this case. In *Oceanport Industries, Inc.,* this Court was presented with the question of whether certain organizations had standing to contest the issuance of permits for pier improvements in publicly owned subaqueous lands (pursuant to title 7, section 7205 of the Delaware Code), for fugitive air emissions (section 6003), and for point source discharge into the Delaware River (section 6003).[9] The organizations challenged the issuance of the permits to the Environmental Appeals Board ("EAB") pursuant to sections 6008[10] and 7210.[11] This Court noted that defining the words "interest" and "substantially affected" was necessary to give meaning to sections 6008 and 7210.

To properly define "substantially affected," this Court turned to the definition espoused by the United States Supreme Court in *Association of Data Processing Serv. v. Camp.*[12] Under *Data Processing,* standing is conferred where there is "1) a claim of injury in fact; and 2) the interest sought to be protected is arguably within the zone of interest to be protected or regulated by the statute. . . ."[13] In *Oceanport,* this Court stated the following reasons for adopting the *Data Processing* test:

There is a logical strength to the application of *Data Processing* to the present case independent of *Agrico.* By enacting the standing provisions, the General Assembly adopted an appeals standard requiring a heightened interest. It seems clear that the intent of the legislature was to limit standing to appeal to those who were actually affected by the Secretary's decisions. It seems equally clear that the General Assembly did not open the flood gates to anyone who merely claimed an interest in the matter. That would have created a totally unworkable administrative structure.

In supplying the necessary interpretation of the term "substantially affected," we adopt the *Data Processing* test because it gives meaning to the obvious intent of the General Assembly. A party who is required to show an injury in fact, and that such injury is within the

---

**9.** *Id.* at 902.

**10.** Del.Code Ann. tit. 7, § 6008 states in pertinent part that "[a]ny person whose interest is substantially affected by any action of the Secretary may appeal to the [EAB] within 20 days after receipt of the Secretary's decision or publication of the decision."

**11.** Del.Code Ann. tit. 7, § 7210 states in pertinent part that "[a]ny person whose interest is substantially affected by any action of the

Secretary or of the Department taken pursuant to this chapter, may appeal to the [EAB] as established by § 6007 of this title within 20 days after the announcement of the decision."

**12.** *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**13.** *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,* 636 A.2d at 903 (quoting *Gannett Co. v. State,* 565 A.2d 895, 897 (Del.1989)).

zone of interest sought to be protected by the statute, clearly comes within the purview of these statutes. Determining standing by such criteria complies with the legislature's goal of administrative workability. Thus, in the absence of any legislative definition of the term "substantially affected", the *Data Processing* test provides a workable and just interpretation.[14]

After acknowledging that the statute invoked here—title 7, section 7007(b)—conferred standing on "any person aggrieved," the Superior Court applied the rationale from *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.* In doing so, the Superior Court noted that "[t]his appeals standard has been construed to require 'a heightened interest,' such that only those who were 'actually affected' by the Secretary's decision may appeal." Accordingly, the Superior Court held that Nichols was required to demonstrate an injury in fact and that such injury was within the zone of interest sought to be protected by the statute.

Nichols argues that the Superior Court erred in relying upon our decision in *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.* Nichols offers the following definition of "aggrieved": "having a grievance; suffering from an infringement or denial of legal rights." Nichols interprets this definition to mean that a person is aggrieved if: "(1) he has a reasonable complaint or objection to the grant of the CZ permit application; or (2) has had rights under the Act detrimentally affected by the CZ Permit application approval." However, Nichols offers no precedent to support his position.

■ In *Oceanport*, we construed the term "substantially affected" as it appears in title 7, section 6008(a) and title 7, section 7210, finding that to have standing to appeal from an Environmental Board's order granting a permit, a party must show there is "injury in fact" and an interest "arguably within the zone of interest to be protected or regulated by the statute." [15] The invasion must be (1) "concrete and particularized," and (2) "actual or imminent, not conjectural or hypothetical." [16] Since this Court relied upon the United States Supreme Court's decision in *Data Processing* to determine standing under the term "substantially affected," we will look to that same decision for guidance in this appeal with regard to the word "aggrieved."

In *Data Processing*, the United States Supreme Court was not only interpreting the meaning of the words "adversely affected" but also addressing the meaning of the word "aggrieved" under the Administrative Procedure Act ("APA")—specifically, pursuant to 5 U.S.C. § 702.[17] Section 702 confers the right of appeal on "[a] person suffering legal wrong because of agency action, or *adversely affected or aggrieved* by agency action." (emphasis added). In *Data Processing*, the United States Supreme Court moved away from a traditional 'legal interest' and 'legal wrong' test and instead "held more broadly that persons had standing to obtain judicial review of federal agency action under section 10 of the APA where they had alleged that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regu-

---

14. *Id.* at 904.

15. *Id.*

16. *Id.* (internal citations omitted).

17. *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

lated' by the statutes that the agencies were claimed to have violated." [18]

■ Although our decision in *Oceanport* did not specifically address the phrase "any person aggrieved" that appears in the statute at issue here, the rationale of *Oceanport* for adopting the *Data Processing* test is equally applicable in this appeal. In fact, our opinion in *Oceanport* makes reference to the CZA, stating, "it seems clear that the General Assembly intended a stricter standing requirement for appeals to the EAB or under the CZA." [19] Nichols has failed to demonstrate that an application of the *Oceanport/Data Processing* test for standing is not warranted based solely on a variance in the statutory language, or that the Superior Court's application of that standard was erroneous based on his own suggested definition of the term "aggrieved." Accordingly, we hold that the *Oceanport* standing requirements must be satisfied to establish that a person is aggrieved as that term is used in the CZA.

The record supports the Superior Court's finding that Nichols "failed to identify or present any evidence relating to any legally-protected interest that has been or will be injured by issuance of a CZA permit to DSGP." Nichols lives approximately fourteen miles from the property affected by the permit. Despite several opportunities, Nichols declined to be sworn in at the Hearing. Thus, he provided no testimony as to how the facility would affect any of his legal rights. Nevertheless, he now broadly claims that he is directly affected by the "probable air and water pollution likely to be generated by the proposed" [20] facility and the negative aesthetic affect on the Coastal Zone.[21] The record reflects that the Superior Court properly applied our holding in *Oceanport* to conclude Nichols lacked standing to appeal because he did not establish that he was an aggrieved person under the CZA.

### Conclusion

The judgment of the Superior Court is affirmed.

**18.** *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See also Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 127, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) (stating that the United States Supreme Court has "interpreted § 702 as requiring a litigant to show, at the outset of the case, that he is injured in fact by agency action and that the interest he seeks to vindicate is arguably within the 'zone of interests to be protected or regulated by the statute' in question.").

**19.** *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d at 901.

**20.** The Board decided that Diamond State's project has received all required New Castle County approvals. Thus, Nichols' concerns are unsupported by the record.

**21.** In his appeal to the Superior Court, Nichols also asserted a claim that he is aggrieved by operation of the New Castle County Comprehensive Development Plan. This claim was not raised by Nichols to the Board, thus, it was not considered by the Superior Court and will not be considered by this Court. *See* Del.Supr. Ct. R. 8.