# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| WILLIAM WHIPPLE III, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N14C-06-215 JRJ |
| PEPCO HOLDINGS, INC., and DELMARVA POWER & LIGHT COMPANY, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## OPINION

Date Submitted: April 27, 2015
Date Decided: July 16, 2015

*Upon Defendants Pepco Holdings, Inc. and Delmarva Power & Light Company's Motion to Dismiss*: **GRANTED.**

Thomas F. Driscoll III, Esquire, Bifferato LLC, 800 N. King Street, Plaza Level, Wilmington, Delaware 19899, George D. Pilja, Esquire (*pro hac vice*) (argued), Foran Glennon, 222 N. LaSalle Street, Suite 1400, Chicago, Illinois 60601, Attorneys for Plaintiff.

Robert W. Whetzel, Esquire (argued), Todd A. Coomes, Esquire, Travis S. Hunter, Esquire, Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attorneys for Defendants.

**Jurden, P.J.**

# I. INTRODUCTION

Before the Court is Defendants Pepco Holdings, Inc. and Delmarva Power & Light Company's Motion to Dismiss. On June 23, 2014, William Whipple III, individually and on behalf of all others similarly situated ("Plaintiff"), filed a class action complaint against Pepco Holdings, Inc. and Delmarva Power & Light Company ("Defendants"). Plaintiff alleges that Defendants are charging an "unjust or unreasonable rate" for electrical power provided by fuel cells known as "Bloom Servers" because the Bloom Servers are consuming more natural gas to generate electricity than is permitted under the Coastal Zone Act Permits.

Plaintiff also asserts a claim of common law fraud, alleging that Defendants "knowingly and recklessly concealed or suppressed" that they were aware the Bloom Servers would consume more natural gas than is permitted.[1]

On September 8, 2013, Defendants filed a motion to dismiss the Complaint arguing that this Court lacks subject matter jurisdiction and that Plaintiff failed to plead fraud with particularity. For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED.**

# II. BACKGROUND

## A. Parties

Delmarva Power & Light Company ("Delmarva") is a Delaware public utility that supplies electricity to Delaware residents.[2]

---

[1] Compl. ¶ 39 (Trans. ID. 55631920).

Delmarva is a subsidiary of Pepco Holdings, Inc. ("Pepco").[3]  Bloom Energy Corporation ("Bloom") designs, manufactures, and provides energy servers ("Bloom Servers") as an alternative means of generating electricity to conventional fossil fuel-based electricity generating sources.[4]

Plaintiff William Whipple is a Delaware resident who purchases electricity from Delmarva for his home.[5]

## B. Renewable Energy Portfolio Standards Act

The Delaware Renewable Energy Portfolio Standards Act ("REPSA") was enacted in 2005.[6]  The purpose and intent of REPSA is "to establish a market for electricity from [renewable energy] resources in Delaware, and to lower the cost to consumers of electricity from these resources."[7]  Accordingly, REPSA requires that a percentage of retail sales of electricity delivered "by a retail electricity supplier . . . include a minimum percentage of electrical energy sales with eligible energy resources and solar photovoltaics . . . ."[8]

---

[2] *Id.* ¶ 3.
[3] *Id.*
[4] *Id.* ¶ 4.
[5] *Id.* ¶ 1.
[6] 26 *Del. C.* § 351.
[7] *Id.* § 351(c).
[8] *Id.* § 354(a).  Prior to 2011, there were two ways a retail electricity supplier could satisfy its renewable energy credit requirements.  The first method was by delivering electricity produced by eligible energy resources, and the second method was by purchasing tradable instruments, referred to as Renewable Energy Credits and Solar Renewable Energy Credits. *See id.* § 352(18), (25).

In July 2011, REPSA was amended to allow a commission-regulated electric company to use energy output from a "Qualified Fuel Cell Provider Project" to satisfy a portion of its renewable energy credit requirements ("QFCP Amendments").[9] A Qualified Fuel Cell Provider Project ("QFCP Project") is "a fuel cell power generation project located in Delaware owned and/or operated by a qualified fuel cell provider under a tariff approved by the [Delaware Public Service Commission] . . . ."[10] A Qualified Fuel Cell Provider ("QFCP") is an entity that "manufactures fuel cells in Delaware that are capable of being powered by renewable fuels," and "is designated . . . as an economic development opportunity."[11]

## C. The QFCP Tariff

The QFCP Amendments were "part of a comprehensive State economic development and clean energy program" pursuant to which Bloom, a fuel cell manufacturer, would build a manufacturing facility in Delaware to produce fuel cells powered natural gas.[12] The QFCP Amendments create a regulatory

---

[9] 78 Del. Laws, c, 99, §§ 1–9. The QFCP Amendments are codified in the Delaware Code with the Renewable Energy Portfolio Standards Act. 26 *Del. C.* § 351.

[10] *Id.* § 352(17). Pursuant to the QFCP Amendments, to be designated as a QFCP, the Secretary of DNREC and the Director of the Delaware Economic Development Officer must designate the proposed fuel cell provider as an "economic development opportunity." *Id.* § 352(16). In order to be designated as an economic development opportunity, the fuel cell provider must "manufacture[] fuel cells in Delaware that are capable of being powered by renewable fuels." *Id.*

[11] *Id.* § 352(16).

[12] Public Service Commission Findings, Opinion and Order No. 8079, ¶ 1 ("PSC Order No. 8079").

framework whereby Delmarva, as the retail electricity supplier, and Bloom, as the QFCP, jointly propose tariff provisions to the PSC, governing the manner in which the QFCP Project will occur.[13] Before a tariff can go into effect, the QFCP Amendments require that the PSC approve and adopt the tariff.[14]

On August 19, 2011, Delmarva filed an application for approval of a new electric tariff ("QFCP Tariff"). Upon approval of the QFCP Tariff, Bloom (as the QFCP) would operate the QFCP Project under the QFCP Tariff, Delmarva would collect funds from its customers pursuant to the QFCP Tariff,[15] and Delmarva would then disburse those funds to Bloom "solely as the agent for the collection and disbursement of funds for the project."[16] The QFCP Amendments provide that Delmarva has no liability except to comply with the QFCP Tariff provisions.[17]

---

[13] *Id.* ¶ 2.

[14] Pursuant to the QFCP Amendments the PSC "was obligated to ensure that the tariff provisions at a minimum, provide for [,] *inter alia*: (1) that the fuel cell project would be of a certain size; (2) at least a 20–year term of service; (3) that the cost to Delmarva customers not exceed a specific price 'cap'; and (4) that the project maintain a certain average efficiency level." *Nichols v. Markell*, 2014 WL 1509780, at *3 (D. Del. 2014) (citing 26 *Del. C.* § 364(d)(l)(a)–(m)) (internal quotations omitted).

[15] *See* 26 *Del. C.* § 364(a) ("[A]ll costs arising out of contracts entered into by a commission-regulated electric company . . . shall be distributed among the entire Delaware customer base of such companies through an adjustable nonbypassable charge which shall be established by the Commission.").

[16] *Id.* § 364(a)–(b).

[17] *Id.* § 364(b).

5

On October 18, 2011, after extensive public comment and an evidentiary hearing, the PSC approved the QFCP Tariff.[18] The PSC issued Order No. 8079 adopting the QFCP Tariff on December 1, 2011.[19]

**D. Coastal Zone Act Permit**

The Coastal Zone Act ("CZA") was enacted "to protect the natural environment of Delaware's bay and coastal areas, by controlling the location, extent and type of industrial development in such areas."[20] The CZA requires a permit for industrial development in Delaware's coastal areas.[21] Pursuant to the CZA, in determining whether to grant a CZA Permit, the Secretary of the Delaware Department of Natural Resources and Environmental Control ("DNREC") may consider: (1) the environmental impact; (2) the economic effect; (3) the aesthetic effect; (4) the number and type of supporting facilities required and the impact of such facilities on all these factors; (5) the effect on neighboring land uses; and (6) county and municipal comprehensive plans for the development and/or conservation of their areas of jurisdiction.[22]

In 2011 and 2012, Diamond State Generation Partners, LLC ("Diamond"), a subsidiary of Bloom Energy, submitted a CZA Permit application to DNREC,

---

[18] Public Service Commission Order No. 8062.
[19] PSC Order No. 8079.
[20] *Nichols v. State Coastal Zone Indus. Control Bd.*, 2013 WL 1092205 (Del. Super. 2013) *aff'd*, 74 A.3d 636 (Del. 2013) (citing 7 *Del. C.* § 7001).
[21] *Id.* The CZA prohibits "the construction of new heavy industry in [Delaware's] coastal areas." *Id.  See* 7 *Del. C.* § 7004.
[22] 7 *Del. C.* § 7004(b)(1)–(6).

seeking permits to construct and operate two facilities to generate electrical power using Bloom Servers—the Brookside Project and the Red Lion Energy Center.[23] Brookside and the Red Lion Energy Center are owned and operated by Delmarva.[24]

In Diamond's CZA Permit applications, Diamond proposed to use Brookside and the Red Lion Energy Center to generate up to 47 Megawatts ("MW") of electrical power.[25] To generate 1 MW of electricity, Diamond proposed that five Bloom Servers would consume "6.6 MMBTU/MWH" of natural gas.[26] DNREC issued CZA Permits for the construction of Brookside and the Red Lion Energy Center in January 2012 and April 2012, respectively.[27]

Plaintiff filed a class action complaint against Defendants alleging that the Bloom Servers are consuming more natural gas than proposed in the CZA Permits and, therefore, the increased electricity charge submitted each month by Defendants to Plaintiff is unjust or unreasonable.[28]

### III. PARTIES' CONTENTIONS

Defendants argue that Plaintiff's Complaint must be dismissed under Superior Court Civil Rule 12(b)(1) because this Court lacks subject matter

---

[23] Compl. ¶¶ 14–24.
[24] *Id.*
[25] *Id.* ¶ 22.
[26] *Id.* ¶ 24.
[27] *Id.* ¶ 25.
[28] *Id.* ¶¶ 29–30.

jurisdiction.[29] Defendants assert that Plaintiff's claims constitute a challenge to the rates Defendants are charging for electricity, and the PSC has exclusive jurisdiction over claims for unjust or unreasonable rates for electricity. Specifically, Defendants argue that the QFCP Tariff governs the amount of natural gas the QFCP is permitted to use and the manner in which the QFCP rates are calculated.[30]

Defendants further argue that Plaintiff's fraud claim should be dismissed under Superior Court Civil Rule 9(b) because Plaintiff fails to plead with particularity that: (1) Defendants made any misrepresentation; (2) Defendants intended to induce Plaintiff to act or refrain from acting in reliance upon an alleged misrepresentation; or (3) that Plaintiff justifiably relied upon the alleged misrepresentation to act or refrain from acting.[31]

In opposition, Plaintiff argues that this Court has subject matter jurisdiction because the allegations in the Complaint relate to a billing controversy between Plaintiff, as a utility rate payer, and Defendants, as utility suppliers, who wrongly overbilled Plaintiff for the supply of electricity.[32]

---

[29] Defendants' Opening Brief in Support of Their Motion to Dismiss (Trans. ID. 56035395).
[30] *Id.* at 16–18.
[31] *Id.* at 21–23.
[32] Plaintiff's Responsive Brief in Opposition to Defendants' Motion to Dismiss at 4–10 (Trans. ID. 56219072).

## IV. STANDARD OF REVIEW

The Court will grant a motion to dismiss under Delaware Superior Court Civil Rule 12(b)(1) if it appears from the record that the Court lacks subject matter jurisdiction over the claim.[33]  Under Rule 12(b)(6), the Court may dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." When considering a motion to dismiss under Rule 12(b)(6), "all factual allegations of the complaint are accepted as true."[34]  The Court will grant a motion to dismiss under Rule 12(b)(6) only where the Court finds that under no set of facts would the plaintiff be entitled to relief.[35]

## V. DISCUSSION

### A.  Subject Matter Jurisdiction

If Plaintiff's claims fall within the exclusive subject matter jurisdiction of the PSC, Plaintiff's Complaint must be dismissed because this Court would lack subject matter jurisdiction.  The relevant authority of the PSC is described in the Delaware Public Utilities Act.  26 *Del. C.* § 201(a) provides that:

> The Commission shall have exclusive original supervision and regulation of all public utilities and also over their rates, property rights, equipment, facilities, service territories and franchises so far as may be necessary for the purpose of carrying out the provisions of this title. Such regulation shall include the regulation of the rates, terms and conditions for any attachment (except by a governmental agency

---

[33] Super. Ct. Civ. R. 12(b)(1).
[34] *Highland Capital Mgmt., L.P. v. T.C. Grp., LLC*, 2006 WL 2128677, at *2 (Del. Super. 2006).
[35] *Id.*

9

insofar as it is acting on behalf of the public health, safety or welfare) to any pole, duct, conduit, right-of-way or other facility of any public utility, and, in so regulating, the Commission shall consider the interests of subscribers, if any, of the entity attaching to the public utility's facility, as well as the interests of the consumer of the public utility service.

While the PSC has the broad authority over the "supervision and regulation of all public utilities," the Delaware Supreme Court has held that billing disputes are for a court to decide.[36]

In support of Plaintiff's argument that this is a billing dispute subject to this Court's (and not the PSC's) jurisdiction, Plaintiff relies on *Malawi v. PHI Service Co.* and *Artesian Water v. Cynwood Club Apartments*. *Malawi v. PHI Service Co.* involved a dispute over a delinquent electric bill.[37] In *Malawi*, the plaintiff rented his residence to a third-party for one year.[38] During this time the plaintiff closed his electric account for the residence and the renter opened a new account.[39] When the plaintiff moved back into his residence and attempted to open a new electric account, he was told that he could not do so because the renter still had a balance due on the account for the residence.[40] The Delaware Court of Common Pleas determined it had jurisdiction, holding that the dispute fell "squarely in the realm

---

[36] *Artesian Water Co. v. Cynwyd Club Apartments, Inc.*, 297 A.2d 387, 389 (Del. 1972) ("The Commission correctly recognized that it 'does not sit as a court of law.' Therefore, it correctly avoided adjudication of the debt controversy between the parties.").

[37] *Malawi v. PHI Serv. Co.*, 2012 WL 986751 (Del. Com. Pl. 2012).

[38] *Id.* at *1.

[39] *Id.*

[40] *Id.*

of billing issues" because the dispute concerned who should pay a delinquent electric bill.[41]

In *Artesian Water v. Cynwood Club Apartments*, a utility customer refused to pay his water bill for a nine-month period during which he alleged that the utility's water service had caused property damage.[42]  While the Delaware Supreme Court held that the PSC had jurisdiction to determine whether the water supplied by the utility was of substandard quality and whether the utility could terminate service during the pendency of the bona fide billing dispute,[43] it also held that the actual billing dispute concerning whether the customer had to pay for the water service was a debt controversy for a court to decide.[44]

Unlike *Malawi* and *Artesian Water*, Plaintiff's allegations here do not relate to a billing dispute.  They are a challenge to the QFCP Tariff.  According to Plaintiff, because the Bloom Servers are consuming more natural gas than proposed in the CZA Permits, the increased electricity charge submitted each month is unjust or unreasonable.[45]  The QFCP Tariff, approved and adopted by the

---

[41] *Id.* at *2–3.
[42] *Artesian Water*, 297 A.2d at 388.
[43] *Id.* at 389–90.
[44] *Id.*
[45] *Id.* ¶¶ 29–30.  Paragraph 28 of the Complaint alleges "the Bloom Servers are consuming more natural gas than the originally claimed maximum of 6.6 MMBTU/MWH for creation of 1MW of electricity." Paragraph 29 alleges that "Defendants' Monthly Report confirms that the [Red Lion Energy] Center's and Brookside's heat rate, or the MMBTU/MWH of natural gas consumed for generation of 1 MW of electrical power was 7.06 for January 2014; 7.05 for February 2014; 7.08

PSC pursuant to the QFCP Amendments—not the CZA Permits—governs the amount of natural gas the QFCP is permitted to use. The QFCP Amendments specifically state that the QFCP Tariff must establish "[a]n average efficiency level that the fuel cells in a project must maintain."[46] Under the QFCP Tariff, the efficiency level of a fuel cell is based upon the amount of natural gas utilized to produce a certain amount of electricity.[47]

Plaintiff's claim for "unjust or unreasonable rates" is a challenge to the QFCP Tariff, a regulatory policy which falls within the PSC's exclusive jurisdiction and, therefore, the claims must be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

**B. Fraud**

Allegations of fraud are subject to a heightened pleading standard. Superior Court Civil Rule 9(b) requires that "the circumstances constituting fraud . . . shall

---

for March 2014; 7.13 for April 2014; and 7.16 for May 2014 – all which are in excess of the 6.60 MMBTU/MWH allowed under the [CZA] Permits."

[46] 26 *Del. C.* § 364(d)(1)(h).

[47] The QFCP Tariff measures fuel cell efficiency in terms of "Heat Rate." Service Classification "QFCP-RC" at P.S.C. Del. No. 8 – Electric, Original Leaf No. 74o § Q. The Heat Rate is a measure of the amount of natural gas that is required to produce a certain unit of electricity. *Id.* Thus, with respect to the amount of natural gas utilized by the QFCP, the QFCP Tariff governs: (1) the calculation of the Target Heat Rate (Original Leaf No. 74d § E); (2) the amount of natural gas the QFCP is permitted to use of each megawatt of electricity generated (Original Leaf No. 74b § C(5)); and (3) what must be done if the quantity of natural gas utilized by the QFCP exceeds the quantity of natural gas that would have been utilized at the Target Heat Rate (Original Leaf No. 74b § C(5)). For example, 74b § C(5) of the QFCP Tariff provides that: "[d]uring any month in which the quantity of natural gas utilized by the QFCP Generator in the Facility exceeds the natural gas that would have been utilized at the Target Heat Rate . . . QFCP Generator shall adjust the monthly invoice in an amount equal to such excess quantity times that month's average daily index price."

12

be stated with particularity." The Court will "disregard conclusory allegations unsubstantiated by specific factual details that would support a rational inference that a particular defendant committed common law fraud."[48]

A claim for common law fraud requires: "(1) a false representation of material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference for the truth; (3) the intent to induce another party to act or refrain from acting; (4) the action or inaction taken was in justifiable reliance on the representation; and (5) damage to the other party as a result of the representation."[49]

The Complaint states, "Defendants, individually and acting as part of a common plan, knowingly and recklessly concealed or suppressed that they were aware that the 135 Bloom Servers would consume more than 6.6 MMBTU/MWH of natural gas to produce 1 MW of electrical power."[50] The Complaint also states, "[d]ue to the concealment and suppression of information by Defendants, the electrical consumers of Defendants were not made aware that the use of Bloom Servers would not only result in higher electricity rates, but that the electrical power generation would be more polluting than other electricity generating

---

[48] *Metro Commc'n Corp. BVI v. Advanced MobileComm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004).
[49] *In re Lyle*, 74 A.3d 654 (Del. 2013) *reinstatement granted*, 86 A.3d 1119 (Del. 2014).
[50] Compl. ¶ 39.

equipment."[51] These allegations do not purport to identify that Defendants made any false representation of material fact, Defendants intended to induce Plaintiff, or Plaintiff justifiably relied on any alleged misrepresentation. Plaintiff's Complaint contains a wholly conclusory allegation of fraud unsupported by specific factual detail. As such, it must be dismissed.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED.** Plaintiffs' claims for "unjust or unreasonable rate for electricity" and fraud are **DISMISSED.**

**IT IS SO ORDERED.**

_____
Jan R. Jurden, President Judge

---

[51] *Id.* ¶ 43.